UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STEVEN B. HATTER,

      Plaintiff,

vs.                                                                    CIVIL NO.:  05-CV-73109-DT

COMMISSIONER OF                                      HON. JOHN FEIKENS
SOCIAL SECURITY,                                      MAG. JUDGE WALLACE CAPEL, JR.

      Defendant.
_____/

## REPORT AND RECOMMENDATION

**I.     RECOMMENDATION**

It is recommended that the Court deny Plaintiff's Motion for Summary Judgment, grant Defendant's Motion for Summary Judgment, and enter judgment for Defendant.

**II.    REPORT**

This is an action for judicial review of the Defendant Commissioner's final decision denying Plaintiff's application for disability insurance benefits [DIB] and supplemental security income [SSI]. Plaintiff filed for benefits on October 21, 2002, alleging that he has been disabled and unable to work since July 15, 1997, due to the fact that he does not "like being around people" and does not like being asked things or told what to do; in addition, he has "mood swings, fluid on lungs, shortness of breath, sleeping problems, memory [problems], and headaches." (TR 37-39, 55). The Social Security Administration [SSA] denied benefits initially on January 8, 2003. (TR 25-28, 323-27). A de novo hearing was held on September 28, 2004, before Administrative Law Judge [ALJ] Regina Sobrino. (TR 329-63). In a decision dated October 8, 2004, the ALJ found that Plaintiff could perform some light work. (TR 12-18). Accordingly, Plaintiff was found not disabled. (TR

1

18). On July 15, 2005, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. (TR 4-6). Plaintiff then made this appeal to district court.

### A.     PLAINTIFF'S TESTIMONY

Plaintiff testified that he lives in a one-story home in Saginaw, Michigan, with his sister. (TR 333, 341). He stated that he was born on June 2, 1954, and was fifty years old at the time of the hearing. (TR 333). He stated that he completed high school and is currently unemployed. Id. Plaintiff stated that he previously worked as a journeyman plumber and pipefitter assigned to Local 85 in Saginaw. (TR 343).

He stated that his onset date was July 15, 1997, and although he had earnings posted after that date, he stated that he did not work past that date. Id. However, he indicated that his memory is poor. (TR 333-34). He then remembered that he worked as a chore provider for his brother Fred, possibly in 2001, and his brother died in 2002. (TR 334). He stated that he thought his brother lived with his sister as well, and he helped him with his medications and fixed him food. Id. He reported that he did this for about a year and a half. Id. Plaintiff explained that nurses brought medication to their home, and he helped open bottles for his brother, because his brother was paralyzed in his right arm. Id.

Plaintiff stated that he is unable to work because he cannot concentrate and has memory loss. (TR 335). In addition, he has trouble getting along with people and a short attention span. Id. Further, he stated that he has mood swings and an anger management problem. Id. He stated that he does not currently have physical limitations that interfere with his ability to stand, walk, or lift. Id. He stated that he takes hydrochlorothiazide and lisinopril for blood pressure, and albuterol, as well as another inhaler. (TR 335-36). He stated that he last used the albuterol (the stronger inhaler) that morning, because he was having shortness of breath from moving around a lot. (TR 335-37). He stated that the stronger inhaler is for emergencies, and the other he uses three or four times daily. (TR 336).

Plaintiff testified that he currently takes fluoxetine and lorazepam, prescribed by Dr. Sorroche, for depression and a nervous condition. (TR 337). In addition, he reported that he takes another medication prescribed by Dr. Hasegawa for seizures, but he could not recall the name of it. Id. He stated that he has been taking the seizure medication for a year. Id. The ALJ stated that the name of the drug was carbamazepine and it was first prescribed in April 2003. Id. Plaintiff stated that he has not had a seizure in six or seven months, and his dose of the medication was increased from once to twice daily. (TR 338). He explained that when he had seizures, "[o]ne minute I'd be standing, next thing I know, I'm on the floor . . . [with] no memory of how I got to the floor. I just wake up on the floor." Id. He stated that he is not aware of any side-effects from his medications. (TR 339).

Plaintiff stated that two years ago he was hospitalized for tuberculosis. Id. He stated that he took about five different medications over the course of a year for his tuberculosis. Id. He stated that he does not take those medications any longer, but he has to go to the doctors every few months to check a spot on his right lung. Id.

Plaintiff explained that stopped using alcohol when he started seeing Dr. Sorroche, his psychiatrist, and has not used it since. (TR 339-40). He stated that it was because of potential interactions between his medications and the alcohol. (TR 340). He then stated that the main reason he quit drinking was because of difficulty sleeping. Id. He stated that when he was drinking he went three to four days at a time without sleep. Id. He stated that he still treats with Dr. Sorroche once every two months. (TR 340, 351). He stated that Dr. Hasegawa treats his seizures, and Dr. Jaswell is his family physician. (TR 341).

Plaintiff stated that he cooks for himself and puts his own clothes in the washing machine. Id. He stated that he also shops for his own groceries. Id. He stated that he does not have any pets or

3

belong to any clubs or organization. Id. He stated that he occasionally goes around to visit friends and family, but they do not visit him. Id. He stated that he used to have hobbies, but not anymore. Id. He stated that he cuts the lawn occasionally with a push mower, but the yard is not very large. (TR 342).

He stated that he drives occasionally, but has to use his sister's vehicle to go to doctor's appointments, because he does not own his own vehicle. Id. Later at the hearing, Plaintiff indicated that he does not have a valid driver's license, because it was suspended for failure to pay tickets.[1] (TR 352-53). He stated that one of his sisters brought him to the hearing. (TR 342). He stated that he does not use a bus system, because he lives "out in the country." Id. Plaintiff stated that he has not taken any trips over seventy-five miles since he stopped working. Id.

Plaintiff stated that he does not know what his psychiatric diagnosis is and summarized his symptoms as follows:

> [m]ood swings, I have trouble sleeping, I sometimes see things that aren't there. Sometimes, I hear things, like I hear people - - I don't know if I'm hearing them or thinking them, but I be having [sic] problems. I – sometimes I just feel the need to reach - - lash out and hurt - - hit something or hurt somebody, something like that. I just get violent. Sometimes I get mad and I be in a room all by myself, you know, and sometimes, if I'm around people, a lot of people that I know - - particularly, they don't like being around me, because they never know how I'm going to react. I may laugh at something one day and the next day I might - - ready to take your head off about it and - - A lot of times, I been - - grab somebody or hit them before I even knew - - I don't know - - I don't even feel like I'm getting mad. All of a sudden it just - - I just - - you know, I just jump on them - - just react.

(TR 343-44). He stated that his anger problems started creating difficulty at work because people started refusing to work with him. (TR 344). He explained that he would get laid off or sent to

---

[1] He stated that his license was never suspended for seizures because it was already suspended for failing to pay the tickets when he began having seizures. (TR 353).

another job and the same thing would happen.  Id.  Plaintiff continued to describe the problems he had at work.  (TR 345).  He stated

> I was getting into competition with the coworkers.  Sometimes I have a low tolerance to people.  I just don't like being around people.  Don't want them saying nothing, don't want to be around them.  Then I was having problems focusing, like at work, I have problem [sic] staying on - - keeping my mind on what I'm doing. And I forget real - - you know - - [INAUDIBLE] if I'm doing something and somebody say something [sic] to me, I'll forget about what I'm doing or what I'm supposed to be doing and go off doing something else, you know.  Or don't let them make a comment about what I'm doing.  That don't - - you know that makes me real - - that's real - - make me [sic] reach for them throw something at them or something - - get away from me.

Id.  He stated that he had physical confrontations with coworkers a few times and shouting matches all the time.  Id.  He explained that although he is trying to work on his anger, he still has problems; thus, he just tries to stay away from people.  Id.  He stated that when he was let go from work, the slip said laid off, but he was actually fired.  (TR 360).  He stated that he was unable to get unemployment benefits.  Id.  He stated that he was not aware of any other laid off employees.  Id.

Plaintiff also indicated, as Dr. Sorroche stated in treatment notes, that Plaintiff tries to pick fights.  (TR 346).  He explained that he thinks about death a a lot, but has been told that hurting himself is wrong.  Id.  Therefore, he tries to pick fights to get other people to hurt him, but he explained that he just ends up hurting the other people.  Id.

Plaintiff explained that he has medicine for his sleep problems, but still has difficulty falling asleep.  Id.  He stated that he will not sleep for two or three days, then he'll sleep all day for one to two days and will not be able to wake up.  (TR 346-47).  He stated that no one ever tries to wake him up. (TR 347).

Plaintiff stated that he does not think that he could pay attention and stay on task for two hours at a time.  (TR 347).  He stated that his mind wanders and he cannot even sit and watch an entire

movie. Id. He reported that his inability to concentrate is worse when other people are around, because they "get on [his] nerves and [he] get[s] pissed." Id. He stated that his memory is not good and that his mind races. (TR 347-48). He stated that he cannot control his thoughts and he is depressed "[m]ost of the time." (TR 348). He testified that he does not know why he is depressed and has crying spells where he cries one minute and is "fighting mad" the next. Id.

He stated that there are times when he "draw[s] a blank," and does not feel, hear, or see anything. Id. He explained that he might think someone is calling him. (TR 350). In addition, he stated that he hears voices that tell him to go to a person's house or to the bar to "look for trouble." Id. He stated that in terms of seeing things, he might see something or someone out of the corner of his eye that is not there. Id. In addition, he stated that when he is in his room watching television, he might actually feel the weight of someone sitting next to him, but there is no one there. Id.

Plaintiff testified that his appetite varies from day to day. (TR 348). As a result, he stated that his weight fluctuates. Id. He stated that his energy level also varies day to day. (TR 349). He stated that he has lost interest in things that he used to enjoy. (TR 348-49). For example, he stated that he used to bowl, lift weights, study karate, and shoot pool. (TR 349).

When Plaintiff's counsel asked him if he ever feels agitated, Plaintiff replied:

> [g]etting a little agitated now, to tell you the truth, but I - - I don't - - asking me a lot of questions gets me agitated. I just - - you know, sometime people [sic] say something that I just don't like. There are some people I just take an instant disliking to and they don't even have to say anything to me. And it's just - - I don't know, it's just how I feel that particular day.

Id. He stated that he has attended anger management classes at Dr. Sorroche's urging, and he avoids people to control himself. (TR 350-51). Plaintiff testified that he withdraws to his room because he prefers to be alone. (TR 351). He stated that he has stayed in his room for up to two weeks, only coming out to go to the bathroom or to get something to eat from the kitchen. Id. He explained that

the house he lives in with his sister is like a duplex with a kitchen dividing it. Id. This way, he is able to stay on his side of the house, and she stays on her side of the house. (TR 351-52). He stated that if his sister wants to contact him, she calls him on the phone because they have separate lines. (TR 352).

Plaintiff stated that in December 2002, he was over a friend's house and got into a fight with another person there over an argument. (TR 353-54). When his friend tried to break up the fight, Plaintiff stated that he beat up his friend, too. (TR 353). He stated that he left when his friend's wife picked up the phone to call the police. Id.

### B.   MEDICAL EVIDENCE

Examination of the parties' cross-motions for summary judgment reveals that an additional recitation of the Plaintiff's medical evidence would be repetitive. The pertinent record medical evidence relied upon by this Court is fully articulated in the Analysis.[2]

### C.   VOCATIONAL EXPERT'S TESTIMONY

Pauline McEachin, a vocational expert [VE], testified at the hearing. (TR 354-60). She classified Plaintiff's past work as light to medium and skilled. (TR 355). The VE testified that any transferable skills would be specific to the plumbing and pipefitting field. (TR 356). The ALJ presented a hypothetical question to the VE regarding a claimant with Plaintiff's age, education, and work experience, who should

> not climb ladders, ropes or scaffolds, a person who should not be exposed to hazards, a person who should not drive as a work duty. Assume a person who should have a clean-air environment. Assume someone who's limited to performing work that is simple and routine. Assume that the person is limited to performing low-stress work. Assume a person who can tolerate superficial contact with coworkers and supervisors, but should not be required to deal with the general public. . . . a history of seizures, a person who shouldn't be lifting, carrying more than 20 pounds.

---

[2] Subpart E, infra, at 9.

(TR 356-57). The VE testified that under these limitations, Plaintiff would not be able to perform his past relevant work. (TR 357). The ALJ asked whether there would be any other work available under the hypothetical. Id. The VE testified that the following light and unskilled jobs existed: visual inspector, 2,200 positions; hand-packer, 5,000 positions; sorter, 1,300 positions; and assembler, 18,000 positions. Id. Further, the VE stated that the following unskilled sedentary jobs also existed under the hypothetical: video surveillance monitor, 2,000 positions; visual inspector, 2,200 positions; inspector, 5,000 positions; and machine operator, 2,800 positions. (TR 357-58).

The VE testified that the maximum absenteeism generally would be no more than once a month. (TR 358). The VE clarified that was excluding sick and "comp" time, as well as personal days. Id. The VE stated that the region was the lower peninsula of Michigan. Id. Further, the VE stated that her testimony was consistent with the information provided in the Dictionary of Occupational Titles [DOT]. Id.

Plaintiff's counsel then questioned the VE. (TR 358-60). Plaintiff's counsel asked whether the inability to stay on task for more than ten minutes for an entire day would impact employability. (TR 358-59). The VE stated that such a limitation would preclude all work. (TR 359). Plaintiff's counsel then asked whether the ability to stay on task for only ten minutes each hour would impact employability. Id. The VE stated that this limitation would also preclude all work. Id.

Plaintiff's counsel then asked whether the inability "accept normal work pressures" and "normal criticism from supervisors or coworkers" in a low-stress job would impact employability. (TR 359-60). The VE testified that if there is difficulty handling work pressures then there is likely going to be "difficulty maintaining employment." (TR 360). Plaintiff's counsel then asked how employability would be affected by a person who reacted violently to situations and pushed, shoved, and screamed. Id. The VE testified that such behavior would preclude employment. Id.

**D.     ALJ'S CONCLUSIONS**

After reviewing the testimony presented at the hearing and the medical evidence in the record, the ALJ found that "[t]he medical evidence indicates that the claimant has a seizure disorder, chronic obstructive pulmonary disease, a personality disorder, and alcohol abuse (episodic, reported to be in sustained remission), impairments that are severe within the meaning of the Regulations" but that he does not have an impairment or combination of impairments set forth in Appendix 1, Subpart P, Regulations No. 4. (TR 14, 17). The ALJ found Plaintiff's testimony not fully credible. (TR 15, 17). She determined that Plaintiff had the RFC to perform some light work. (TR 15-18). Thus, the ALJ concluded that Plaintiff is not eligible for disability. (TR 18).

**E.     ANALYSIS**

Plaintiff advances three claims in his Motion for Summary Judgment. Plaintiff's Motion argues that the ALJ's decision is not supported by substantial record evidence because (1) the ALJ failed to find his bipolar disease a severe impairment; (2) the ALJ did not properly assess his credibility; and (3) the ALJ failed to defer to the treating psychiatrist and did not assess Plaintiff's GAF in determining the RFC.[3] In response, Defendant's Motion for Summary Judgment contends that these aspects of the ALJ's decision are supported by substantial evidence.[4] The matter is now ready for decision.

---

[3] Plaintiff's Motion for Summary Judgment and Brief filed December 5, 2005 (hereinafter "Plaintiff's Brief"), at pages 6-9. See also Plaintiff's Reply Brief filed January 30, 2006 (hereinafter "Plaintiff's Reply").

[4] Defendant's Motion for Summary Judgment and Brief filed January 26, 2006 (hereinafter "Defendant's Brief"), at pages 8-12.

### 1. Standard of Review

This Court's review of the ALJ's conclusions is limited. The findings of the ALJ regarding Plaintiff's disabled status are conclusive if supported by substantial. 42 U.S.C. § 405(g) (2006). Substantial evidence means such evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971). It is more than a scintilla of evidence, but less than a preponderance of evidence. Brainard v. Sec'y of Health and Human Servs., 889 F.2d 679, 681 (6th Cir. 1989). This standard presupposes that there is a "zone of choice" within which the ALJ may make a decision without being reversed. Felisky v. Bowen, 35 F.3d 1027, 1035 (6th Cir. 1994). Even if the court might arrive at a different conclusion, an administrative decision must be affirmed if it is supported by substantial evidence. Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir. 1986). Finally, consideration of the whole record does not mean that the ALJ must mention or comment on each piece of evidence submitted. Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998). Applying these standards, I will analyze each of Plaintiff's claims.

### a. Severe Impairment

Plaintiff argues that the ALJ failed to find his bipolar disorder severe.[5] Specifically, he alleges that the ALJ failed to address his bipolar illness and its related symptoms, and any effect it has on his ability to work.[6] In Farris v. Sec'y of Health and Human Servs., 773 F.2d 85, 90 (6th Cir.1985) (quoting Brady v. Heckler, 724 F.2d 914, 920 (11th Cir.1984)), the Sixth Circuit defines an impairment that is not severe as a "slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education and work experience." However, when Farris was being decided, the Secretary also

---

[5]Plaintiff's Brief at pages 7-8.

[6]Plaintiff's Brief at page 8. See also Plaintiff's Reply at page 2.

>issued an interpretive ruling, SSR 85-28, in which the agency clarified its implementation of 20 C.F.R. § 404.1520(c) in light of several court decisions. The ruling emphasized that an impairment was to be found not severe only when medical evidence established a slight abnormality or combination thereof which would have no more than a minimal effect on a claimant's ability to work even if the individual's age, education, or work experience were specifically considered.

Salyers v. Sec'y of Health and Human Servs., 798 F.2d 897, 901 (6th Cir. 1986).

Nevertheless, if the ALJ considers the impairment past Step 2, it is irrelevant whether it was severe. Hamilton v. Sec'y of Health & Human Servs., 991 F.2d 795, 1993 WL 106845, at *6-7 (6th Cir. 1993). "Since the Secretary properly could consider claimant's . . . condition in determining whether claimant retained sufficient residual functional capacity to allow him to perform substantial gainful activity, the Secretary's failure to find that claimant's . . . condition constituted a severe impairment could not constitute reversible error." Maziarz v. Sec'y of Health & Human Servs., 837 F.2d 240, 244 (6th Cir. 1987). Although the ALJ did not find Plaintiff's bipolar disorder severe, she did continue his analysis through Step 5. (TR 15-17). Thus, there is not reversible error. In addition, Dr. Hasegawa reported that on June 5, 2003 that "[a]lthough he carries a diagnosis of bipolar disease, symptomology was not explained on that basis." (TR 173).

Further, Plaintiff does not allege that any specific work related symptoms were not considered by the ALJ as she continued her analysis. "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." McPherson v. Kelsey, 125 F.3d 989, 995-96 (6th Cir. 1997) (citation omitted). Thus, the ALJ did not err is this regard.

### a. Credibility

Plaintiff argues that the ALJ failed to properly assess his credibility.[7] The ALJ's credibility determination is analyzed under 20 CFR § 404.1529(c)(3). That regulation states that

> [w]hen determining credibility, in addition to the objective medical evidence, the ALJ must also consider:
> 1. The individual's daily activities;
> 2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;
> 3. Factors that precipitate and aggravate the symptoms;
> 4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
> 5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
> 6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 minutes to 20 minutes every hour, or sleeping on a board); and
> 7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

20 CFR § 404.1529(c)(3). Further, the regulations clearly set forth that "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements." 20 CFR § 404.1529(c)(2). In addition, as Social Security Ruling (SSR) 96-7p points out, the ALJ's "determination or decision must contain specific reasons for the finding on credibility . . . to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."

The ALJ stated the following in assessing credibility:

> [t]he claimant's allegations that he can perform no sustained work activity because of shortness of breath, depression, and sleeping and memory problems are not fully credible. They are inconsistent with the objective medical evidence, the absence of more aggressive treatment, and the claimant's ordinary activities. While the claimant

---

[7]Plaintiff's Brief at pages 8-9, Plaintiff's Reply at pages 2-3.

> might experience some shortness of breath and emotional stress, he has responded well to treatment and his symptoms are controlled with prescribed medication. The medical record contains no significant complaints of medication side effects or ineffectiveness. No physician has reported that the claimant is totally and permanently disabled. The claimant gets along well with family members and communicates clearly. He routinely cares for his own personal needs, prepares meals, shops for groceries, performs and [sic] household chores such as cutting the grass and laundry. He spends time, [sic] watching television, listening to the radio and visiting with family members. He reports asocial behavior, but the record makes references to social contanct [sic] with friends (Exhibit 8E).

(TR 15). The ALJ is correct in terms of her analysis of side effects from medications. Plaintiff even testified that he does not suffer from same.[8] (TR 339).

However, in terms of his psychiatric treatment notes, although it is noted that earlier in treatment he indicated that he was "[d]oing 'better' on present medication;" (TR 193), it is noted on several occasions later that Plaintiff reported on various occasions that his "depression is about the same with present medication," that his "medications are not working," that he is "[n]ot doing well on present medication," and his "depression is 'back again' with present medication." (TR 170, 177, 182, 184, 186, 194, 279). Thus, as far as Plaintiff's psychiatric problems, it is not clear from the record that they are as effective as the ALJ infers. (TR 15).

The ALJ cites Plaintiff's Daily Activities Questionnaires form from November 22, 2002, through May 17, 2003, for the preposition that he has social contacts with friends, but a review of those records reveals that he stated that he visits friends and/or family "every now and then," and that he specifically sees "a lady friend" during those visits, but he only stays depending on whether "she makes [him] mad or not." (TR 92-93). While an ALJ is not required to discuss each and every piece of evidence, he or she "may not pick and choose the portions of a single report, relying on some and

---

[8]It is noted that Plaintiff once reported drowsiness as a side effect from his medications. (TR 60). See also Plaintiff's Brief at page 5. How ever this is clearly inconsistent with his more recent testimony that he is unaware of any side effects. (TR 339).

ignoring others, without offering some rationale for his decision." Young v. Comm'r of Soc. Sec., 351 F. Supp.2d 644, 649 (E. D. Mich. 2004). Nonetheless, his sister stated that "[h]e keeps to himself [and] sometimes he will walk and visit a friend." (TR 97). Further, the undersigned notes that on Daily Activity Sheets from August 2004, he reported that he "went to see a friend" on August 31, 2004. (TR 108). In addition, at the hearing Plaintiff testified that he visits friends and family "every now and then." (TR 341).

Plaintiff specifically points to the following impairments that the ALJ did not discuss in her credibility analysis: "social isolation, anger, hallucinations, inability to sleep, impaired concentration and memory."[9] However Plaintiff does not cite to the record within his argument. Again, superficial and perfunctory argument are waived. McPherson, 125 F.3d at 995-96. Nonetheless, the undersigned will examine Plaintiff's allegations regarding an inability to sleep. The ALJ mentions Plaintiff's sleeping problems in the beginning of her credibility analysis, but it is not clear on what basis she rejects that allegation. (TR 15). However, the ALJ did consider Plaintiff's reported inability to sleep to Dr. Sorroche. (TR 13).

Plaintiff alleges that his sister corroborates his inability to sleep and reports that he "is up for days."[10] However, in reviewing the documents upon which Plaintiff relies, the undersigned finds that his sister reported that "he *says* he doesn't sleep much, [s]ometimes he's *away* for days." (TR 97) (emphasis added). Dr. Hasegawa's treatment notes indicate on June 5, 2003 that Plaintiff "should have slept during [an] EEG, but he was not able to make it." (TR 173). However, this is the only objective evidence of sleeping problems. Plaintiff's sleep complaints are otherwise entirely subjective. Although there is conflicting evidence in this regard, as well as in regard to the effectiveness of his

---

[9]Plaintiff's Brief at pages 8-9.

[10]Plaintiff's Brief at page 5.

14

medication, it is not the job of the undersigned to resolve same. Any conflict in the doctor's reports suggested by Plaintiff is not for the Court to decide. The Sixth Circuit has stated that it is not the responsibility of the Court "to resolve conflicting evidence in the record." Wright v. Massanari, 321 F.3d 611, 614 (6th Cir. 2003) (citation omitted).

The standard is substantial evidence and it appears that the ALJ's credibility analysis is supported by same, even though this may be a close call.

> The ALJ may have been wrong, but he was not unclear; after listening to what [Plaintiff] said on the witness stand, observing his demeanor, and evaluating that testimony in the light of what appears in the written medical records, the ALJ concluded, rightly or wrongly, that [Plaintiff] was trying to make his symptoms and functional limitations sound more severe than they actually were. It is the ALJ's job to make precisely that kind of judgment.

Gooch v. Sec'y of Health and Human Servs., 833 F.2d 589, 592 (6th Cir. 1987). Further, the "ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference," and should not be disturbed. Walters v. Comm'r of Soc. Sec., 127 F.3d 525, 531 (6th Cir. 1997) (citation omitted).

### c. Treating Psychiatrist and GAF

In his Reply Brief, Plaintiff raises for the first time the argument that the ALJ did not properly consider the opinion of his treating psychiatrist and disregarded his GAF of 50.[11] Plaintiff alleges that Dr. Sorroche, his treating psychiatrist, had a medical opinion that conflicted with the non-examining state agency doctor's opinion.[12]

---

[11]Plaintiff's Reply at page 3.

[12]Plaintiff's Reply at page 3.

Plaintiff argues that the ALJ improperly relied on the state agency doctor in determining Plaintiff's RFC.[13] Plaintiff argues that the problem lies in Dr. Sorroche's GAF of 50, which shows a "serious impairment in social, occupational or school function."[14] In contrast, "[t]he State Agency medical consultant was of the opinion that Plaintiff's psychiatric impairment was not severe and imposed only mild or moderate functional limitations."[15] Though there appears to be conflicting evidence, Defendant correctly points out that the

> treating psychiatrist, Dr. Sorroche, made no findings concerning Plaintiff's functional limitations. However, Dr. Newhouse, a state agency medical consultant, reviewed Plaintiff's medical record in January 2003, and did made [sic] functional limitation findings, and the ALJ's RFC assessment was fully consistent with these limitations.
> For example, the ALJ limited Plaintiff to low-stress, routine, unskilled work, taking into account Dr. Newhouse's finding of moderate difficulty in carrying out detailed instructions or maintaining attention and concentration (Tr. 18, 120-21). Similarly, the ALJ limited Plaintiff from performing work with more than superficial contact with co-workers and supervisors, and completely restricted him from work around the general public, taking into account Dr. Newhouse's finding that Plaintiff had a moderately difficulty in working with or near others, interacting with the public, or accepting instructions or criticism from supervisors (Tr. 18, 120-21). These limitations also take into account Plaintiff's testimony that he controlled his anger problems by avoiding contact with others (Tr. 350-51).[16]

Further, the ALJ did not necessarily err in disregarding the GAF in this case. "While a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy. Thus, the ALJ's failure to reference the GAF score in the RFC, standing alone, does not make the RFC inaccurate." Howard v. Comm'r of Soc. Sec., 276 F.3d 235, 241 (6th Cir. 2002)

---

[13]Plaintiff's Reply at page 3.

[14]Plaintiff's Reply at page 3 (citing Defendant's Brief at page 4.).

[15]Plaintiff's Reply at page 3 (citing TR 123-27).

[16]Defendant's Brief at page 10.

In addition to the fact that Dr. Sorroche did not implement functional limitations, it bears repeating that Plaintiff's own testimony was that the only factors that keep him from working are his inability to concentrate and his memory loss. (TR 335). In addition, he has trouble getting along with people, a short attention span, mood swings, and an anger management problem.[17] Id. These factors are taken into consideration, as noted above, in Dr. Newhouse's assessment and the ALJ's RFC. Thus, Plaintiff has not shown that the ALJ's decision is supported by less than substantial evidence.

### III.   CONCLUSION

For the reasons stated, I find that the ALJ's decision denying Plaintiff benefits is substantially supported in the record. Accordingly, I respectfully recommend that the Court **DENY** Plaintiff's Motion for Summary Judgement, **GRANT** Defendant's Motion for Summary Judgment, and enter judgment for Defendant Commissioner.

Pursuant to Fed. R. Civ. P. 72(b) and 28 U.S.C. § 636(b)(1), the parties are hereby notified that within ten days after being served with a copy of the recommendation they may serve and file specific, written objections within ten days after being served with a copy thereof. The parties are further informed that failure to timely file objections may constitute a waiver of any further right of appeal to the United States Court of Appeals. United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

In accordance with the provisions of Fed. R. Civ. P. 6(b), the court in its discretion, may enlarge the period of time in which to file objections to this report.

   s/Wallace Capel, Jr.
**WALLACE CAPEL, JR.**
**UNITED STATES MAGISTRATE JUDGE**

**Dated:**   August 16, 2006

---

[17] Plaintiff attended anger management classes voluntarily and successfully. Defendant's Brief at pages 11-12 (citing TR 297-301). In fact, Plaintiff reported to Sharleen Gray, the Addictions Nurse, that he was "looking forward to attending [the] anger management group" on August 6, 2003. (TR 314). Further, on September 2, 2003, he reported that his "moods have been better as of late," and he also reported that he was "really getting a lot out of [the] anger management group." Id.

17

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

**CERTIFICATE OF SERVICE**

I hereby certify that on August 16, 2006, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the following: Janet L. Parker and Donald T. Popielarz,

and I hereby certify that I have mailed by United States Postal Service the paper to the following non-ECF participant(s): Social Security Administration, Office of the Regional Counsel, 200 W. Adams Street, 30th Floor, Chicago, Illinois 60606.

                                                              s/James P. Peltier
                                                              United States District Court
                                                               Flint, Michigan 48502
                                                               810-341-7850
                                                               E-mail: pete_peltier@mied.uscourts.gov